JOSEPH A. GOMES, AAL LLC (6789)
Pacific Justice Institute
1170 Nuuanu Avenue
Suite 105, No. 37475
Honolulu, Hawaii 96837
Telephone: 808-780-4179
E-mail: jgomes@pji.org

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| DANIEL KELLY; | § | Civil No.: _____ |
|---|---|---|
| Plaintiff, | § § § | |
| vs. | § § § | **Complaint for Employment Discrimination; Demand for Jury Trial; Summons** |
| HEALTHCARE ASSOCIATION OF HAWAII; and DOES 1-20, | § § § § | |
| Defendants. | § | |

**COMPLAINT FOR EMPLOYMENT DISCRIMINATION**

The above-named Plaintiff, by and through his attorneys and for his Complaint against the above-named Defendants, alleges and avers as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this discrimination in employment action pursuant to:

   - Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (religion); and

   - 28 U.S.C. § 1331 (federal question jurisdiction)

1

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(1)-(2) because Defendant is a domestic nonprofit corporation residing in the District of Hawaii, and a substantial part of the events giving rise to this Complaint occurred in the District of Hawaii.

## PARTIES

3. Plaintiff DANIEL KELLY ("Mr. Kelly" or "Plaintiff") is a resident of Hawaii.

4. Defendant HEALTHCARE ASSOCIATION OF HAWAII ("Defendant") is a domestic nonprofit corporation registered under the laws of the State of Hawaii.

5. DEFENDANT DOES 1-20 are individuals, partnerships, corporations and/or entities who are sued herein under fictitious names for the reason that their true names and/or responsibilities are presently unknown to Plaintiff except that Plaintiff is informed and believes that they are connected in some manner with the named Defendant and/or are responsible for all or a portion of the conduct and damages alleged herein which occurred on or about the dates and times more particularly described in this Complaint, and who are or may be necessary parties in order for the Court to grant the appropriate relief in this matter. Plaintiff has initiated a review of the respective responsibilities relating to this Complaint, as described herein, as a diligent and good faith effort to ascertain the identity, actions, and liability of said DOE Defendants.

Plaintiff will make the name or identity of the DOE Defendants known within a reasonable time after Plaintiff identifies such Defendants and/or their responsibilities.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. All conditions precedent to filing this Complaint under Title VII have been performed or have occurred.

7. Defendant is an employer subject to Title VII.

8. Mr. Kelly timely filed with the U.S. Equal Employment Opportunity Commission ("EEOC") a Title VII charge of religious discrimination and unlawful retaliation against Defendant.

9. The EEOC issued Mr. Kelly a Right to Sue notice on September 11, 2023.

10. This case is brought within 90 days of the EEOC Right to Sue notice.

## FACTUAL ALLEGATIONS

11. Defendant hired Mr. Kelly in May 2017, for a position in Logistics and Planning. In 2019, Defendant promoted Mr. Kelly to the position of Operations and Logistics Coordinator.

12. In August 2021, Defendant imposed on its workforce a mandatory covid policy which, among other things, required its employes to provide "proof of a COVID-19 vaccination by September 30, 2021" (the "Policy").

13. The Policy notified employees that they could submit a request for an accommodation from the Policy based on their sincerely held religious belief, or due to medical reasons.

14. The Policy stated that "[e]mployees who fail to comply with these requirements will be subject to disciplinary measures, up to and including termination of employment, unless a reasonable accommodation is requested and approved."

15. In an effort to comply with the Policy and to keep his job, on August 30, 2023, Mr. Kelly timely submitted a request for an accommodation from the Policy's covid shot requirement ("Request").

16. Mr. Kelly's Request was based on his sincerely held religious belief as a Christian that prevents him from taking the covid shots.[1]

---

[1] Mr. Kelly's Request included the following statement:

> As a Christian, I believe the Bible is the inspired living word of God. The Bible states that each believer will receive the Holy Spirit who will guide them in their walk with God. Vaccines to me are comparable to what non-kosher foods are to orthodox Jews. Although experts may say non-kosher foods are healthy, faith compels certain individuals to decline their consumption. Likewise, even if experts say vaccines are healthy, my faith compels me to decline their consumption. I respectfully assert my religious objection to this vaccine.

*Id.*

17. The Request included a statement by Mr. Kelly that he was open to all reasonable alternatives, to include masking, social distancing, and periodic testing.

18. Defendant did not question the sincerity of Mr. Kelly's religious beliefs as the basis for his Request.

19. Instead, on September 10, 2021, Defendant arbitrarily and capriciously informed Mr. Kelly that it would terminate his employment, effective October 1, 2021 ("Termination Letter").

20. Between the brief time when Mr. Kelly submitted his Request and Defendant issued the Termination Letter, Defendant did not engage in a good faith interactive process with Mr. Kelly to discuss a reasonable accommodation – which existed.

21. Rather than engage in a good faith interactive process, Defendant, utilizing two senior executives, summoned Mr. Kelly to a "meeting" where they demanded that he identify accommodations to support his Request – while offering none themselves.

22. In fact, this was not a meeting initiated by Defendant for the purpose of engaging in a good faith interactive process.

23. Instead, this was a planned retaliatory ambush of Mr. Kelly ("The Ambush").

24. It was clear that whatever reasonable alternatives Mr. Kelly provided during The Ambush, and he provided several, Defendant was predetermined not to accept or offer any due to its unreasonable retaliatory animus towards Mr. Kelly on account of his Request.

25. In fact, prior to The Ambush, Mr. Kelly spoke with his supervisor, Marc Moriguchi, to discuss potential reasonable accommodations to Mr. Kelly's Request.

26. During this discussion, Mr. Moriguchi acknowledged that no accommodations were required because there was no foreseeable situation where any hinderance to Mr. Kelly's duties would occur as a result of granting his Request.

27. For example, throughout the covid pandemic and before Defendant imposed its Policy, Mr. Kelly successfully delivered supplies to and interacted with hospitals and their personnel while the hospitals had covid shot requirements in place.

28. Mr. Moriguchi further informed Mr. Kelly that if any reasonable accommodations became necessary, that he would make them for Mr. Kelly.

29. But since there was no foreseeable actual hinderance to Mr. Kelly performing his duties after the Policy was imposed if his Request was granted, no specific

accommodations were discussed between Mr. Moriguchi and Mr. Kelly prior to The Ambush.

30. Defendant manipulated the information it gathered from The Ambush as a retaliatory pretext to support terminating Mr. Kelly's employment.

31. Additionally, in its Termination Letter Defendant did not identify any specific basis, particular to Mr. Kelly's duties, to support its arbitrary and capricious termination of his employment.

32. Defendant instead relied on hypothetical, conclusory, and/or self-serving statements, which it may not do, to justify its refusal to provide a reasonable accommodation to Mr. Kelly on the basis of an alleged undue hardship.[2]

33. For example, Defendant asserted in the Termination Letter that its,

> staffing consists of a small team of only four members in total, with three of these members participating in missions, exercises, emergencies, disasters, deliveries, communication system reports, and other activities. Reducing the resources to two members will create situations where inadequate resources are available to carry out the mission or task at hand.
>
> We discussed your proposed accommodations with the Director and we all agreed that maintaining the essential job responsibilities of your position as described in the job description is best for the fair and efficient operation of the unit and the provision of service.

---

[2] *See Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir. 1981) (undue hardship requires "proof of actual imposition on coworkers or disruption of the work routine" rather than "conceivable or hypothetical hardships")(internal quotation marks and citation omitted)).

34. Defendant did not explain what "situations" would be created "where inadequate resources are available to carry out the mission at hand" if it granted a reasonable accommodation to Mr. Kelly.

35. Nor did Defendant explain "the essential job responsibilities" of Mr. Kelly's position, or what is "best for the fair and efficient operation of the unit and provision of service."

36. The verbiage Defendant set out in its Termination Letter to justify denying Mr. Kelly an accommodation is meaningless.

37. Furthermore, the job of one of Mr. Kelly's co-workers employed by Defendant ("Co-Worker") was terminated concurrent with Mr. Kelly's job termination because, upon information and belief, Co-Worker did not take the covid shot and did not request an accommodation from the Policy.

38. Co-Worker performed job duties materially similar to Mr. Kelly's.

39. However, upon information and belief, only a few days later, Defendant re-hired Co-Worker, even though Co-Worker had not taken the covid shot and had not requested an accommodation from the Policy.

40. Co-Worker's employment with Defendant continued for a least another year, even though Co-Worker had not taken the covid shot.

41. At all times it employed Mr. Kelly, Defendant was legally obligated to follow the law, to include Title VII.

42. This includes the legal requirement to provide reasonable accommodations for employees, like Mr. Kelly, who object to terms of employment on the basis of their sincerely held religious beliefs.

43. In this case, no reasonable accommodations would create an undue burden because Defendant's normal business practices followed prior to the Policy would completely resolve any accommodation issue if one arose.

44. Defendant, in fact proved this point:  Upon information and belief, after Defendant terminated Mr. Kelly's employment, all his job duties were transferred to others, including to Co-worker who assumed much of Mr. Kelly's duties and who did not take the covid shot for at least a year.

45. Additionally, Defendant removed the job posting to replace Mr. Kelly and did not fill his terminated position for at least a year.

46. An employer may only be relieved from providing a reasonable accommodation under Title VII if they can establish that doing so would create for it an undue hardship.

47. To prove an undue hardship, Defendant must show that granting a reasonable accommodation to Mr. Kelly would create for it "a burden [that] is *substantial* in the overall context of [Defendant's] Business."[3]

48. Defendant has not and cannot meet this burden.

49. Furthermore, by imposing the Policy on its workforce, Defendant's purported goal was to "safeguard the health of our employees and their families; our customers and visitors; and the community at large from infectious diseases."

50. Laudable as Defendant's goal may have been, it was never achievable by mandating its employees take the covid shot – or else lose their job and livelihood.

51. In fact, the Policy was irrational and capricious from the start because, before Defendant imposed its Policy, it was widely known that the covid shots do not prevent the spread of the covid virus, and that "fully vaccinated" individuals spread and become sick with the covid virus.

52. For example, in December 2020, almost a year before Defendant imposed its Policy, the FDA unequivocally stated that the "data are not available to make a determination about how long the [covid] vaccine will provide protection,

---

[3] *See Groff v DeJoy*, 2023 U.S. LEXIS 2790, 28 (US 2023)(undue hardship requires showing of substantial, not merely *de minimis*, cost impact on employer)(emphasis added).

*nor is their evidence that the vaccine prevents transmission of SARS-CoV-2 from person to person.*"[4]

53. And by early August 2021, before Defendant imposed its Policy, the US Centers for Disease Control unequivocally confirmed that the approved covid shots "can't . . . prevent transmission."[5]

54. So it was clear before Defendant imposed the Policy that the covid shots do not prevent contracting or spreading the covid virus.[6]

---

[4] *See FDA Takes Key Action in Fight Against COVID-19 By Issuing Emergency Use Authorization for First COVID-19 Vaccine;* December 11, 2020, https://www.fda.gov/news-events/press-announcements/fda-takes-key-action-fight-against-covid-19-issuing-emergency-use-authorization-first-covid-19 (last visited November 29, 2023) (emphasis added).

[5] *See Fully vaccinated people who get a Covid-19 breakthrough infection can transmit the virus, CDC chief says;* August 8, 2021, at https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday (last visited November 29, 2023).

[6] *See Medical Professionals for Informed Consent v Bassett*, 78 Misc. 3d 482, 491-492; 185 N.Y.S.3d 578, 586; 2023 N.Y. Misc. LEXIS 258, 15 (NY Sup. Ct., Onondaga Cnty. 2023)(declaring void New York State's covid shot mandate on healthcare workers; finding covid shots do not prevent transmission of the covid virus; finding "fully vaccinated" is "[a] term which is defined at the whim of an entity, subject to change without a moment's notice[,] contains all the hallmarks of "absurdity" and is no definition at all"); *and Matter of Medical Professionals for Informed Consent v Bassett,* 2023 N.Y. App. Div. LEXIS 5028, 4 (NY Sup. Ct., App, Div, 4th Dept. 2023)(mooting NY State's appeal after State unilaterally repealed its covid shot mandate for healthcare workers, while leaving trial court ruling in place; the appellate court is "precluded from considering the merits of the issues raised on appeal and we take no position on the propriety of the judgment appealed from.").

55. Moreover, many employers, including the State of Hawaii and its Counties, while imposing covid mandates on their employees, granted accommodations, including religious accommodations, to their employees from taking the covid shots.

56. This includes accommodations that the State and Counties granted to first responders; that is, accommodations from the covid shot for those whose job is to provide intimate, face-to-face emergency health care and rescue to individuals.

57. Defendant coerced Mr. Kelly with the loss of his job if he did not comply with the Policy; it ignored its obligation to engage with Mr. Kelly in the interactive process to seek a reasonable accommodation to his Request; it retaliated against him by utilizing The Ambush as a pretext; and it terminated his employment after he would not be coerced but remained true to his sincerely held religious beliefs.

58. These adverse employment actions by Defendant against Mr. Kelly were unlawful.

59. Furthermore, Defendant's unlawful adverse employment actions against Mr. Kelly were intentional, willful, wanton, oppressive, and/or grossly negligent, *i.e.,* punitive in nature, entitling Mr. Kelly to punitive damages.

60. As a direct result of Defendant's unlawful adverse employment actions against him, Mr. Kelly has been damaged substantially.

## CLAIMS FOR RELIEF

### Count I
### Violation of Title VII of the Civil Rights Act of 1964
### (42 U.S.C. § 2000e, et seq.)
### * Failure to Accommodate on the Basis of Religion *

61. The foregoing Paragraphs are incorporated herein.

62. Title VII forbids an employer from refusing a job to someone because of his need for religious accommodation, absent proof that granting the accommodation would cause the employer an undue hardship.

63. Mr. Kelly timely submitted his Request for an accommodation from Defendant's Policy based on his sincerely held religious beliefs.

64. Defendant did not question the sincerity of Mr. Kelly's religious beliefs.

65. Defendant unlawfully rejected Mr. Kelly's Request and instead took unlawful adverse employment actions against him.

66. These unlawful actions include coercing Mr. Kelly with the prospect of terminating his employment in violation of his constitutionally protected sincerely held religious beliefs; intentionally failing to engage him in a good faith interactive process for a reasonable accommodation; retaliating against him with The Ambush; and then terminating his employment when he would

not be coerced but remained true to his constitutionally protected sincerely held religious beliefs.

67. And other than hypothetical, conclusory, self-serving statements, Defendant has not identified any specific hardship, let alone any undue hardship, that excuses its unlawful adverse employment actions against Mr. Kelly.

68. In fact, reasonably accommodating Mr. Kelly would not have imposed an undue hardship on Defendant, and reasonable accommodations were in fact available for Mr. Kelly to follow, to include masking, periodic testing, and social distancing as appropriate.

69. Other workplaces granted employees accommodations from their covid shot mandates, with masking, periodic testing, and appropriate social distancing as reasonable accommodations.

70. Moreover, Defendant rehired Co-Worker, who had not taken the covid shot and who had not requested an accommodation from the Policy, and allowed Co-Worker to continue working for at least another year with job duties materially similar to Mr. Kelly's.

71. This while Mr. Kelly's job was terminated, and Defendant did not hire him back.

72. Defendant's actions expose its purported accommodation terms under the Policy as a sham. Its actions demonstrate an unlawful animus towards Mr. Kelly because of his sincerely held religious beliefs.

73. Defendant's unlawful adverse employments actions against Mr. Kelly as described above violate Title VII.

74. As a result, Mr. Kelly has suffered damages, to include punitive damages, in amounts to be proven at trial.

### Count II
### Violation of Title VII of the Civil Rights Act of 1964
### (42 U.S.C. § 2000e, et seq.)
### * Retaliation *

75. The foregoing Paragraphs are incorporated herein.

76. Title VII forbids an employer from retaliating against an employee who requests an accommodation based on a sincerely held religious belief, or who files a complaint because an accommodation was denied.

77. "In order to establish a prima facie case of retaliation under Title VII, [an employee] must demonstrate that (1) []he engaged in an activity protected under Title VII; (2) [his] employer subjected [him] to an adverse employment

action; and (3) a causal link exists between the protected activity and the adverse employment action."[7]

78. Mr. Kelly satisfies all three elements of his *prima facie* case of Title VII retaliation inflicted by Defendant because:

79. He engaged in the protected activity of requesting an accommodation from the Policy based on his sincerely held religious beliefs;

80. His job was terminated after Defendant conducted The Ambush, which was designed as a retaliatory pretext because Mr. Kelly submitted his Request, a protected activity, and due to Defendant's animus towards Mr. Kelly because his Request was based on his sincerely held religious beliefs, which beliefs are likewise protected by law;

81. His job was terminated, without any meaningful interactive process, after he submitted his Request, and based merely on Defendant's conclusory and pretextual assertions that he could not be accommodated; and

82. There is a causal link between the two – Mr. Kelly's protected Request for an accommodation and Defendant's adverse employment actions resulting in the termination of his employment – and because there is no good faith or reasonable explanation for why he was mistreated as he was.

---

[7] *See Thomas v. City of Beaverton*, 379 F.3d 802, 811 (9th Cir. 2004)(citation omitted).

83. Defendant engaged in unlawful retaliatory conduct against Mr. Kelly which is a violation of Title VII.

84. As a result, Mr. Kelly suffered damages, including punitive damages, in amounts to be proven at trial.

## REQUEST FOR RELIEF

85. WHEREFORE, Mr. Kelly incorporates by reference each and every allegation contained in the preceding paragraphs as though fully stated herein, and prays that the Court grant him the following relief:

    a. All appropriate and legally available monetary relief, including compensatory damages, damages for pain and suffering, and punitive damages in amounts to be determined at trial, to make him whole for the harms that he suffered as a result of Defendant's unlawful conduct as alleged in this Complaint, and to sanction Defendant for its punitive conduct;

    b. Any interest at the legal rate on such damages as appropriate, including pre- and post-judgment interest;

    c. A reasonable amount of attorneys' fees for the work of his attorneys in pursuit of this action and the protection of his rights;

    d. All costs, disbursements, and expenses that were paid or incurred on his behalf and in pursuit of his claims as set forth in this Complaint;

e. Any other relief as allowed by law;

f. Retain jurisdiction in order to enforce this Court's judgments; and

g. Such additional relief the Court deems just and proper.

DATED: Honolulu, Hawaii, November 30, 2023.

*/s/Joseph A. Gomes*
JOSEPH A. GOMES

Attorney for Plaintiff
Daniel Kelly
